NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

**FEDERAL BUSINESS CENTERS, INC.,**

  **Plaintiff,**

    v.

**UNITED STATES OF AMERICA,**

  **Defendant.**

---

Docket No.: 12-cv-7099-WJM-MF

**OPINION**

---

### WILLIAM J. MARTINI, U.S.D.J.:

Defendant United States of America ("the government") moves to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Defendant argues that the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), deprives the court of jurisdiction.  For the reasons set forth, the motion is denied.


## I.  BACKGROUND

Plaintiff Federal Business Centers, Inc. ("FBC") is the primary owner of property at the Raritan Center Business Park ("Raritan Center").  (*See* Complaint at ¶ 5)  FBC alleges that it suffered property damage as a result of a deteriorating drainage system on an adjoining piece of property.  The adjoining piece of property, known as Parcel D, is surplus U.S. government property that has been lying vacant for about fifty years.  (*See* Declaration of John Marcic ("Marcic Decl.") at ¶ ¶ 4-9; Declaration of Eric Marrinan ("Marrinan Decl.") at ¶ 11)  The United States General Services Administration ("GSA") is responsible for the maintenance and disposal of excess and surplus government property like Parcel D.

## A. GSA's Surplus Property Policies

Pursuant to the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 101, GSA cares, handles, protects, and maintains excess and surplus properties.[1]  (Declaration of John Kelly ("Kelly Decl.") at ¶ 7)

Federal regulation directs GSA to:

(a) Manage excess and surplus real property, including related personal property, by providing only those minimum services necessary to preserve the Government's interest and realizable value of the property considered;
(b) Place excess and surplus real property in productive use through interim utilization, provided, that such temporary use and occupancy do not interfere with, delay, or impede its transfer to a Federal agency or disposal;[2] and
(c) Render safe or destroy aspects of excess and surplus real property that are dangerous to the public health or safety.

41 C.F.R. § 102-75.945.  GSA's Handbook on Excess and Surplus Real Property ("GSA Handbook") echoes the regulation.  Its objectives in the protection and maintenance of surplus properties are:

(1) [t]o follow sound real estate management practices in providing the minimum services required to protect the property, the public, and to preserve the government's equity therein; (2) [t]o place the property in productive use, if at all possible, through interim use provided that such temporary use and/or occupancy will not interfere with or delay disposal; (3) [t]o avoid an attractive public nuisance or make safe any property that is dangerous to the public health or the environment; and (4) [t]o limit the costs of improvements or alterations except where disposal cannot otherwise be made.

---

[1] "Excess property" is property that is not required to meet the needs of a government agency.  40 U.S.C. § 102(3). "Surplus property" is excess property that the GSA Administrator has determined is not required to meet the needs of any federal agency.  40 U.S.C. § 102(10).
[2] Normally, GSA disposes of surplus property within a year or two.  (Deposition of John Marcic at 62:7-16)

(Defendant's Exhibit 2 at GSA02-00017; Kelly Decl. at ¶ ¶ 8-9)

In a Declaration, John Kelly, GSA's Director of Real Property Utilization and Disposal, stated that the policy of providing only the "minimum services necessary to protect the government's interest in excess and surplus property is based on concerns of sound fiscal management." (Kelly Decl. at ¶ 11)  But at his deposition, he made it clear that the policy did not direct GSA to allow cost to be a determinative factor in directing GSA's actions.  (*See*, *e.g.*, Kelly Deposition at 125:10-126:15)  Providing "minimum services" includes protecting non-government adjacent landowners from harm.  (*Id.* at 113:7-13)  Concerning the policy to "render" a property safe for the public, GSA employees testified that where there is an eminent threat to public health, the environment, or an individual, GSA will take any action necessary.  (*Id.* at 93:21-9, 125:10-126:4; *see also* Deposition of Eric Marrinan at 50:24-51:14, 145:24-148:9) (noting that GSA is required to take immediate action to stop dangers to public health and the environment)

### B.  Parcel D

Parcel D is a vacant lot covered by trees, shrubs, grasses, streams, and culverts.  (Marcic Decl. at ¶ 9)  It is bordered by EPA property to the north and west and by FBC's property to the east and south.  (Marcic Decl. at ¶ 9)

Both Parcel D and FBC's property were once part of the Raritan Arsenal.  In 1964, the United States Army reported Raritan Arsenal as "excess" property.  (Marcic Decl. at ¶ ¶ 3-4)  When GSA acquired Raritan Arsenal, it contained a drainage system that drains water from higher elevations to lower lands and eventually into the Raritan River.  (Marcic Decl. ¶ ¶ 4-5; Moving Brief at 7)  In 1965, GSA sold 2,300 acres of the Raritan Arsenal property to Federal Storage Warehouses, the predecessor of FBC.  (Marcic Decl. at ¶ 5)  In 1988, Parcel D became "surplus" government property.  (Marcic Decl. at ¶ 9)

Parcel D's drainage system connects directly into the drainage system on FBC's property, which lies downstream from Parcel D.  (*See* Complaint at ¶ 9)  For several years, FBC's drainage system has experienced and continues to experience, as a recurring and ongoing condition, a reduction in conveyance capacity significant enough to cripple the system's functionality.  (Complaint at ¶ 10)  The cause of the recurring reduction in the conveyance capacity of the FBC's drainage system is the accumulation of alluvial sediment in that system.  (Complaint at ¶ 11)  The sediment causing the problems on FBC's property is the result of erosion from the stream banks on and around Parcel D.  (Complaint at ¶ 12)

After contacting GSA by phone, a consultant for FBC wrote a letter to GSA in October 2008.  The letter requested a review of Parcel D, "First to attempt to alleviate the erosion of silt flowing onto Federal Business Centers (FBC) properties downstream, and secondly to determine the availability of those lots for acquisition by FBC."  (Defendant's Exhibit 8)  GSA apparently did not conduct this review.  In late Spring 2009, FBC again contacted GSA with a complaint about sediment washing off Parcel D and onto FBC's property.  (Marcic Decl. at ¶ 10)  It does not appear that GSA meaningfully responded to this request either.

Finally, GSA employees participated in a phone conference with FBC representatives to discuss the erosion of sediment on or about February 9, 2010.  (Declaration of Eric Marrinan ("Marrinan Decl.") at ¶ 7)  By this time, FBC had already spent $207,885 to facilitate the removal of enough sediment to restore a portion of its system to working order.  (Complaint at ¶ 14)

In Spring 2010, Eric Marrinan, a GSA employee, inspected Parcel D and noticed that one pipe in particular, which was located near a large basin, had broken.  (Marrinan Decl. at ¶ 7)  He also noticed erosion of soil in the area of the broken pipe.  (*Id.*)  GSA then hired a consultant, Matthew Noviello, to "determine the cause of a large accumulation of sediment that repeatedly occurred in a stream bed" on FBC's property.  (Final Report of Matthew Noviello ("Noviello Report") at 7)

GSA employees expressed concerns about both the ultimate costs of the repairs recommended in Noviello's draft report and about GSA's ultimate responsibility for the condition.  (Declaration of Damien Santomauro, Esq. ("Santomauro Decl."), Exhibit F)  The draft report noted that conditions on adjacent pieces of property belonging to the EPA and Raritan Center were partly responsible for the drainage problem on Parcel D.  (*Id.*)  One internal GSA e-mail sent after its author read the draft report stated, "I expect that the corrective action needed . . . will be significant and I question if it is solely the government's responsibility to pay."  (*Id.*)

In September 2010, Noviello delivered his official report to GSA.  (Marrinan Decl. at ¶ 9)  This report listed fifteen steps that "must be taken" in order to "stop future erosion from occurring on the GSA site and sediment from accumulating in the downstream beds."  (Noviello Report at 4-6)  One of Mr. Noviello's recommendations was to repair the broken pipe that Eric Marrinan had observed in his Spring 2010 inspection. (Marrinan Decl. at ¶ 9)  But Noviello also recommended other measures.  One was lining the beds and banks of streams on Parcel D with

stone because the drainage systems on the GSA property could not handle the additional loads.   (Noviello Report at 4)   Other recommendations included redirecting runoff entering Parcel D from adjoining properties and the repair of many pipe joints that, if left unattended, would cause "premature catastrophic failure." (Noviello Report at 4-6)

Marrinan contacted Noviello to let Noviello know of GSA's intent to dispose of the property.  (Santomauro Decl., Exhibit G)  Marrinan requested a "solution to match our limited budget."  (*Id.*)  Noviello advised that fixing the broken pipe that Marrinan had seen was the "most critical" of the repairs.  (*Id.*)

Mr. Marrinan was unhappy that the EPA had been left out of the discussion and stated in an e-mail that the EPA seemed to have "pushed this onto GSA." (Santomauro Decl., Exhibit G)   Marrinan noted a Congressman's office was advocating GSA to spend upwards of $500,000 on the project, which seemed like a waste to Marrinan, because any developer would "properly dismantle any new system GSA puts in."  (*Id.*)

An internal GSA e-mail dated November 17, 2010 stated that a consultant would be hired to prepare a "scope of work to do short-term repairs on the site to improve the soil erosion condition."  (Santomauro Decl., Exhibit I)  Noviello provided three alternative plans in the Scope of Work.  (Santomauro Decl., Exhibit K)   The first involved just the repair of the broken pipe and its immediate surroundings.  (Marrinan Decl. at ¶ 15)  The second alternative involved armoring the stream beds at the northern end of the stream, and the third alternative involved the armoring of all sections of the stream.  (Marrinan Decl. at ¶ 16)  The work was put out for contract bids.   The first alternative was priced at about $50,000. (Santomauro Decl., Exhibit J), and second and third alternatives were priced between $200,000 and $550,000.  (Marrinan Decl. at ¶ 16)  GSA allotted $50,000 to the project.  (Santomauro Decl., Exhibit L)

In March and April 2011, FBC requested a meeting with GSA to discuss the remedial work that was to be done. (Santomauro Decl., Exhibit H)  Internal GSA e-mails reveal that GSA did not wish to hold this meeting so as to avoid conflict.  In one of these e-mails, a GSA employee stated that he did not want to be "[stuck] with these people [FBC]" because GSA did not "have the money to do the whole scope that [Noviello] came up with" and feared that FBC would not be satisfied with the "least expensive fix."  (Santomauro Decl., Exhibit H)

Upon completion of the "least expensive fix," an internal GSA e-mail dated August 18, 2011 stated that the property was ready to be turned over for disposal. (Santomauro Decl., Exhibit J)  But another internal e-mail from August 2011 expressed doubts about the sufficiency of the repairs:

> We know that [FBC] will not be happy with the outcome and will almost certainly dispute that what was done there was insufficient. That said, we need to start to plan to address this site and what will happen if the problems continue. . . . Once Raritan Center sees all we did was fix the broken existing system, not upgrade to a modern system to better handle all this water, they will get their congressman involved and we will have to defend our actions.

(Santomauro Decl., Exhibit M)

### C. Status of Parcel D

In September 2011, FBC again complained to GSA.  FBC told GSA that "Hurricane Irene (to large extent) and the persistent erosion since we formally brought this issue to GSA's attention (to a lesser extent) has dumped a tremendous amount of silt into the drainage system on our property." (Santomauro Decl., Exhibit N)  This complaint included photographic evidence of the continued problem.  (*Id.*)

Eric Marrinan inspected Parcel D after Hurricane Irene and again in January 2013.  (Marrinan Decl. at ¶¶ 20-21)  He observed that the repaired pipe continued to function and that there was no visible evidence of any significant erosion having occurred on Parcel D during 2012.  (*Id.* at ¶ 21)  FBC claims that the erosion of sediment continues to threaten FBC's land and that a portion of it will be permanently lost if more work is not done.  (Declaration of John Orozco)  In 2012, FBC began another sediment removal project with costs projected to exceed $250,000.  (Complaint at ¶ 15)  GSA still has not disposed of Parcel D.

## II. LEGAL STANDARD

Plaintiff moves pursuant to Federal Rule of Civil Procedure 12(b)(1) for dismissal for lack of subject matter jurisdiction.  Because the government's challenge to jurisdiction is a factual one under Rule 12(b)(1), the court is not confined to the allegations in the Complaint and can look beyond the pleadings to decide factual matters relating to jurisdiction.  *Cestonaro v. U.S.*, 211 F.3d 749, 752

(3d Cir. 2000).  In a Rule 12(b)(1) motion, the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

## III.   DISCUSSION

### A. The Discretionary Function Exception to the FTCA

The government argues that it is immune to suit under the discretionary function exception to the Federal Tort Claims Act.  "The Federal Tort Claims Act is a partial waiver of the sovereign immunity that would otherwise protect the United States from tort liability stemming from the actions of its employees."  *Cestonaro v. U.S.*, 211 F.3d 749, 752-53 (3d Cir. 2000).  The purpose of the FTCA is to make the United States liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.

There are several exceptions to the FTCA's waiver of government immunity, including the "discretionary function" exception, 28 U.S.C. § 2680.  This statutory exception to tort liability gives the government immunity from:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).

### B.  Applicability of the Discretionary Function Exception

Plaintiff bears the burden of proving subject matter jurisdiction.  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  In a case where the government challenges subject matter jurisdiction based on the discretionary function exception, the plaintiff meets his burden by establishing that the claims fall within the scope of the FTCA.  *See S.R.P. ex rel. Abunabba v. U.S.*, 676 F.3d 329,

333 (3d Cir. 2012). The Government has the burden of proving the applicability of the discretionary function exception. *Ibid*.

Determining applicability is a three-part analysis. As a threshold matter, the court must identify the conduct at issue. *Abunabba*, 676 F.3d at 333. Then, the court must analyze the conduct in light of the two-pronged test set forth in *U.S. v. Gaubert*, 499 U.S. 315 (1991). *Merando v. U.S.*, 517 F.3d 160, 164 (3d Cir. 2008).

## C. The Two-Pronged *Gaubert* Test

The discretionary function exception implicates a two-part analysis set forth in *U.S. v. Gaubert*, 499 U.S. 315 (1991). First, the court inquires whether the challenged action was discretionary, as opposed to being governed by mandatory statute or regulation. *Gaubert*, 499 U.S. at 322. Second, if the challenged conduct is "discretionary," then the court must determine whether the discretionary act is of the kind that the discretionary function exception was designed to shield. *Id.* at 322-23 (*citing Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988)); *see also Varig Airlines*, 467 U.S. at 813 ("[T]he basic inquiry concerning the application of the discretionary function exception is whether the challenged acts . . . are of the nature and quality that Congress intended to shield from tort liability."). The Supreme Court has stated that the discretionary function exception was designed to shield those discretionary acts which are "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

The *Gaubert* test is difficult to apply. *See Smith v. Washington Metro. Area Transit Auth.*, 290 F.3d 201, 215 (4th Cir. 2002) (Michael, C.J., concurring). The statute fails to define "discretionary function," *Gotha v. U.S.*, 115 F.3d 176, 179 (3d Cir. 1997), and courts inconsistently interpret the type of act that Congress intended the discretionary function exception to shield, *see Payton v. U.S.*, 679 F.2d 475, 479 (5th Cir. 1982), *O'Toole v. U.S.*, 295 F.3d 1029, 1035 (9th Cir. 2002). The U.S. Supreme Court has stated that the development of the case law on the discretionary function exception has "not followed a straight line," which makes reconciling conflicting case law difficult. *O'Toole*, 295 F.3d at 1035 (*citing Varig*, 467 U.S. at 811-12). *Gaubert* left the definitional threshold of "policy" uncertain. *See* Harold J. Krent, *Preserving Discretion Without Sacrificing Deterrence: Federal Governmental Liability in Tort*, 38 UCLA L. Rev. 871, 915 n. 119 (1991); *see also Smith*, 290 F.3d at 215. Virtually any government action can be said to be related to a policy, and yet the discretionary function exception should not render the FTCA "toothless." Krent, *Preserving Discretion*, 38 UCLA L. Rev. at 915 n. 119; *Cestonaro v. U.S.*, 211 F.3d 749, 755 (3d Cir. 2000).

The Ninth Circuit in *O'Toole v. U.S.* conceptualized the discretionary function exception as a "spectrum." 295 F.3d 1029, 1035 (9th Cir. 2002). On one end of the spectrum are acts totally divorced from policy, like negligent driving, which "can hardly be said to be grounded in regulatory policy." *Id.* (quoting *Gaubert*, 499 U.S. at 325 n. 7). At the other end of the spectrum are acts "fully grounded in regulatory policy," such as the regulation of banking, the release of vaccine lots, and the enforcement and implementation of airline safety standards. *Id.* (internal citations omitted).

This case involves negligent land maintenance where the basis for action or inaction is purely fiscal. Applying the *Gaubert* test to such facts is particularly difficult, as these types of cases frequently fall somewhere in the middle of the spectrum. Opinions in negligent land maintenance cases are inconsistent and sometimes difficult to reconcile. *Compare Cestonaro v. U.S.*, 211 F.3d 749, 759 (3d Cir. 2000) (holding that exception did not protect government failure to remedy a known dangerous condition on government land) *with Mitchell v. U.S.*, 225 F.3d 361, 362 (3d Cir. 2000) (holding that exception did protect government failure to remedy a known dangerous condition on government land).

### 1.   *First* Gaubert *Prong*

The first prong of the *Gaubert* test requires the Government to prove that the challenged act is discretionary.  In order to be "discretionary," the challenged acts must "involve an element of judgment or choice." *Gaubert*, 499 U.S. at 322.  The government only fails this prong of the test where a "federal statute, regulation, or policy specifically prescribes a course of action," and the government fails to follow that course of action." *Id.* (citing *Berkovitz*, 486 U.S. at 536).  In such cases, the government will be held liable because "the employee has no rightful option but to adhere to the directive." *Ibid.*

### 2.   *Second* Gaubert *Prong*

If the challenged conduct is "discretionary," then the analysis proceeds to the second *Gaubert* prong.  In this prong of the test, the court must determine whether the discretionary act is of the kind that Congress designed the discretionary function exception to shield. *Gaubert*, 499 U.S. at 322-23.

The U.S. Supreme Court has held that Congress designed the exception to shield conduct "'grounded in the policy of the regulatory regime,' and 'based on the purposes that the . . . regime seeks to accomplish.'" *S.R.P. ex rel. Abunabba v. U.S.*,

676 F.3d 329, 336 (3d Cir. 2012) (*quoting Gaubert*, 499 U.S. at 325 & n. 7).  "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 324-25.

"[W]hen properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (internal citations omitted).  "The discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537.  "Where the Government cannot articulate a genuine policy reason that it failed to take an action, the act is not considered to be based in policy, and the exception will not apply." *Cestonaro*, 211 F.3d at 755.  There must be a "rational nexus" between the agency's decisions and social, economic, or political concerns. *Id*. at 759.

Susceptibility analysis is not a "toothless standard that the government can satisfy merely by associating a decision with a regulatory concern." *Cestonaro*, 211 F.3d at 755.  "Susceptible to policy analysis" must not be given too broad a construction; otherwise the discretionary function exception would almost completely nullify the goal of the FTCA. *Gotha*, 115 F.3d at 179.

The purpose of the exception is to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. *Gotha*, 115 F.3d at 179 (*quoting Varig*, 467 U.S. at 814).  The exception is meant "to protect the Government from liability that would seriously handicap efficient government operations." *Cestonaro*, 211 F.3d at 759 (*citing Varig*, 467 U.S. at 814).

 "[A]pplication of the discretionary function exception should be sensitive to both the need for deterrence and the need for protecting government agencies from judicial intrusion." Krent, *supra*, 38 UCLA L. Rev. at 885.  The exception ought not apply where other forces adequately constrain the government's actions, notably, "the administrative process and the accompanying safeguards of generality, prospectivity, and deliberation." *Id*. at 873-74.  "The discretionary function exception should therefore generally hinge, not on the nature of the governmental action challenged, but on the process by which that action is reached." *Id*. at 874.

Plaintiff relies heavily on analogy to Ninth Circuit precedent, particularly the case of *O'Toole v. U.S*, 295 F.3d 1029 (9th Cir. 2002), which has two notable similarities.  First, *O'Toole* involved the government's failure to maintain a ground water

system, which resulted in a perpetual sediment buildup problem on the plaintiffs' land.  Second, the government proffered budgetary limitations as the only genuine "policy" basis for the negligent maintenance.

In *O'Toole*, the plaintiffs owned a ranch located upstream from government property under the care of the Bureau of Indian Affairs (BIA).  The government negligently maintained an irrigation system on its land, which caused water and sediment to back up onto the O'Tooles' ranch.  BIA regulations required any project concerning its irrigation system be "economical" and made provision of funds subject to the availability of appropriations.  *Id.* at 1034-35.  The government "characterized its decision to forego needed repairs and maintenance as a proper exercise of agency discretion, in which the BIA was forced to make a judgment call to achieve its policy and goals."  *Id.* at 1035-36.

The Ninth Circuit rejected the government's argument.  It held "that an agency's decision to forego, for fiscal reasons, the routine maintenance of its property—maintenance that would be expected of any other landowner—is not the kind of policy decision that the discretionary function exception protects."  *O'Toole*, 295 F.3d at 1036.  It justified this opinion as follows:

> The danger that the discretionary function exception will swallow the FTCA is especially great where the government takes on the role of a private landowner.  *Cf. Gotha v. United States,* 115 F.3d 176, 179 (3d Cir. 1997) ("[I]f the word 'discretionary' is given a broad construction, it could almost completely nullify the goal of the [FTCA].").  Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources.  As we have noted before in the discretionary function exception context, "[b]udgetary constraints underlie virtually all governmental activity."  *ARA Leisure Servs.*, 831 F.2d at 196.  Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly.  Instead, in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly.  *See, e.g., Kielwien v. United States*, 540 F.2d 676, 681 (4th Cir. 1976) ("The [FTCA] is remedial and should be liberally construed to grant the relief contemplated by Congress . . . . .").

*O'Toole*, 295 F.3d at 1037.

The Third Circuit has granted immunity to the government when the cause of particular omissions were fiscal. However, these protected omissions only occur when the government demonstrates that it has weighed the costs of remediation against the risk of harm. This internal weighing of costs and risks is evident in *Mitchell v. United States*, 225 F.3d 361 (3d Cir. 2000), a case that GSA cites as analogy.

*Mitchell* concerned a car accident. The plaintiff swerved on a government road in order to avoid an accident, and in the process, ran off the road and was severely injured. The presence of a ditch and headwall that the government knew was in disrepair was responsible for the injuries. *Id.* at 363. The National Park Service received this road, Route 209, from the Commonwealth of Pennsylvania in a bad state of repair in 1983. *Id.* at 365. In 1986, the National Park Service conducted a study that found dangers all along Route 209, including the type which injured the plaintiff. *Id.* at 365. The government study prioritized repairs in connection with a goal of turning Route 209 into a "scenic parkway." *Id.* at 365-66. Repairs were made to the extent that Congress allocated funds. *Id.* at 366. Under these conditions, the Third Circuit was satisfied that the National Park Service had "balance[d] the costs of the repairs of every culvert head-wall along Route 209, along with the other safety issues identified in the 1986 study, against the low risk of an accident." *Id.* at 366.

The weighing of costs and risks was also key to the decision to give the government immunity in *S.R.P. ex rel. Abunabba v. U.S.*, 676 F.3d 329 (3d Cir. 2012). In *Abunabba*, the Third Circuit granted immunity to the government for failing to post warning about barracudas in a swimming area where barracuda attacks where very rare. The Third Circuit wrote, "We have previously held that assessments of the respective degrees of risk presented by natural hazards and decisions regarding appropriate responses to such risks are susceptible to policy analysis." *Id.* at 337 (*citing Mitchell*, 225 F.3d at 363, 366, *Merando v. U.S.*, 517 F.3d 160, 162 (3d Cir. 2008)). The Third Circuit found that the National Park Service had "discretion to *strike a balance* between economics, aesthetics and risk in determining the appropriate response to hazards in the national parks." *Id.* at 346 (emphasis added).

In the land maintenance context, the deliberate balancing of risks and costs is the dividing line between policy decisions and unprotected omissions. The deliberate balancing of risks and costs reconciles the different outcomes of *O'Toole* and *Mitchell*. It also reconciles the differing outcomes in *Mitchell* and the two other most germane Third Circuit cases, *Gotha v. U.S.*, 115 F.3d 176 (3d Cir. 1997)

(finding government was not immune from Navy's failure to maintain a footpath) and *Cestonaro v. U.S.*, 211 F.3d 749, 752 (3d Cir. 2000) (finding government was not immune from National Park Service's failure to provide adequate lighting in or warnings about parking lot known to have a violent crime problem).

### 3. *Presumptions in the* Gaubert *Test*

According to *Gaubert*, if the government action passes the first prong of the test, there is a "strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." 499 U.S. at 324. This is a rebuttable presumption. *Cestonaro*, 211 F.3d at 755 n. 4 (*citing Gaubert*, 499 U.S. at 324-25). There are many cases in this jurisdiction and others where a government act satisfies the first *Gaubert* prong and yet fails the second prong. This is especially true in cases where the government's "policy" concerns are largely related to budget and the challenged government action is a failure to maintain. *See, e.g., Gotha*, 115 F.3d at 179; *Cestonaro*, 211 F.3d at 755; *O'Toole*, 295 F.3d at 1036.

### D. Analysis

#### 1. *Challenged Conduct*

The analysis begins by defining the government conduct at issue. *Abunabba*, 676 F.3d at 333. The government fashions the challenged action as GSA's decision not to implement the entire Noviello Report. The thrust of FBC's argument, however, goes deeper than that. FBC is challenging, via causes of action for trespass, negligence, and nuisance, GSA's allowing the conditions on Parcel D to damage FBC's land. (Complaint at ¶¶ 40-72) To limit the challenged act simply to GSA's choices about how to implement the Noviello Report would miss the mark. The court finds that the conduct at issue is GSA's failure to remedy the conditions on Parcel D that are damaging FBC's land.

#### 2. *Gaubert Test*

GSA's failure passes the first prong of the *Gaubert* test. However, it fails the second prong of the *Gaubert* test. The court therefore has jurisdiction.

13

### a. *First Prong*

GSA's duty to eliminate the hazard is evident from the regulations, from the GSA Handbook, and from the deposition of John Kelly.  41 C.F.R. § 102-75.945(c) states that GSA shall "render safe or destroy aspects of excess and surplus real property that are dangerous to the public health or safety."  GSA's Handbook on Excess and Surplus Property states that it is GSA's objective to "make safe any property that is dangerous to the public health or the environment."  According to John Kelly, where the GSA Handbook states that GSA shall "provid[e] the minimal services necessary to protect the . . . public," the word "public" includes non-government adjacent landowners.  (Kelly Dep. at 113:7-13)  The erosion and resulting flooding in this case are unsafe conditions that are deleterious to the downstream environment and to the people who own and work on FBC's land.  GSA had an affirmative duty to eliminate this hazardous condition.

Nevertheless, GSA does pass the first *Gaubert* prong because of *Gaubert*'s strict language.  The regulations and policies here do not "specifically prescribe[] a course of action" for eliminating the hazard, and the fixing of the hazardous condition in this case did "involve an element of judgment or choice."  *Gaubert*, 499 U.S. at 322.  This is not to say that GSA had the choice to ignore the problem altogether or to make ineffective repairs and then abandon the condition.  Rather, GSA had the ability to make various choices in its efforts to "render safe" the aspects of Parcel D that posed a danger to FBC's land.  For example, it could have given the land outright to FBC, as FBC indicated it might accept in its initial 2008 complaint.  It also could have worked collaboratively with the EPA and FBC on finding the source of the increased water flow on the properties upstream from Parcel D.

### a. *Second Prong*

FBC has demonstrated that the GSA fails the second *Gaubert* prong.  GSA's abandonment of the erosion problem was not the kind of act that Congress designed the discretionary function exemption to shield.  *Gaubert*, 499 U.S. at 322-23.  GSA fails the second *Gaubert* prong for six reasons:

First, the manner in which GSA conducted itself demonstrates not a mere abuse of discretion, but a complete failure to attend to an affirmative duty to eliminate hazardous conditions.  The regulations and GSA Handbook do not demonstrate an intent to give GSA the choice to permit this hazard to continue for years without implementing a meaningful correction.

At the outset, GSA completely ignored FBC's complaints for sixteen months before it even began discussing any action. By that time, FBC had already incurred $207,885 in remedial costs.

While GSA did take a small step in the direction of eliminating the hazardous condition, the parties dispute whether the limited repair eliminated the hazardous condition. The evidence that the limited repairs eliminated the hazardous condition is not persuasive. The expert's report stated that all fifteen steps "must be taken" in order to stop the erosion problem. The expert did not give those steps an order of priority until after GSA pressured the expert to propose a "solution to match our limited budget." (Santomauro Decl., Exhibit G) The expert never opined that doing limited repairs would solve the problem. Moreover, internal GSA e-mails demonstrate GSA's awareness that these limited repairs were not sufficient to solve the problem. (Santomauro Decl., Exhibits F, H, M) Although Eric Marrinan reported that he saw no erosion after Hurricane Irene, this statement is contradicted by continued complaints from FBC and photographic evidence. (Santomauro Decl., Exhibit N) In light of the continued complaints and photographic evidence, Marrinan's inspection only supports the conclusion that the limited repairs were insufficient. His inspection demonstrates that even with the new pipe in working order, the erosion problem had not been corrected.

Second, the abandonment of Parcel D for fiscal reasons contradicts the directions in GSA's Handbook. The GSA Handbook states that the GSA shall "limit the costs of improvements or alterations *except where disposal cannot otherwise be made*." Considering that GSA has been unable to dispose of Parcel D since it became excess property in 1964, the court concludes that GSA was not able to dispose of Parcel D. Therefore, it would not be within the scope of GSA's Handbook to allow the condition of Parcel D's drainage system to destroy the property of its downstream neighbor based on concerns about GSA's limited resources.

Third, the GSA fails to demonstrate that it exhibited a weighing of the costs of repair against the risks of harm, which is the key characteristic of a policy-based decision. *See Mitchell*, 225 F.3d at 366. Nowhere does GSA consider the risk of harm to FBC in its decision to limit the repairs to $50,000.

Fourth, the ongoing and unavoidable harm to the Plaintiff in this case distinguishes it from the hazards in *Mitchell* and *Merando*, which the government cites as precedents in its favor. The facts of *Merando* are fairly similar to those in *Mitchell*. In *Merando*, the plaintiff challenged the National Park Service's execution of its policy to remove hazardous trees after a falling tree killed the plaintiff's wife and

daughter.  517 F.3d 160.  In both *Mitchell* and *Merando*, the government made decisions about allocating resources to hazards after calculating the risk of accidents against the cost of repairs.  In this case, there was an ongoing and unavoidable harm, as opposed to a mere risk of an accident.  In *Abbunaba*, the Third Circuit recognized that the discretionary function exemption would not protect the government from ignoring blatant safety hazards like the one in this case.  *Abunabba*, 676 F.3d at 340 n.6 ("Although NPS decisions regarding whether and to what extent to warn the public of the dangers posed by wildlife will generally be susceptible to policy analysis, it is possible that the NPS could be aware of a safety hazard so blatant that its failure to warn the public could not reasonably be said to involve policy considerations.").

*O'Toole* is the more applicable case.  A case like *Mitchell* or *Merando* would apply where the government confronts the risk of an *accident.*  The Third Circuit has yet to address a case like *O'Toole*, where the government's omissions place an adjacent landowner in imminent peril of being subjected to ongoing and unavoidable property damage.  *O'Toole* provides the appropriate principle of law for addressing a case where the government fails to address hazards on its own land that create an imminent, ongoing, and unavoidable harm to adjacent landowners.

Fifth, it is highly unlikely that Congress intended to allow the government, when acting as a landlord, to shift the responsibilities of an ordinary landlord onto its neighbors and call it "policy."  *Cf. O'Toole*, 95 F.3d at 1036 ("To apply the discretionary function exception to shield the [government's] alleged negligence would unfairly allocate the resulting harm on the O'Tooles.").  The discretionary function exception's purpose was to prevent the threat of lawsuits from choking the efficiency of government policy-making processes.  *See Varig*, 467 U.S. at 813.  Where the government justifies abandonment of affirmative land maintenance responsibilities on purely fiscal grounds, the court's intervention does not interfere with a genuine policy-making process.  *See O'Toole*, 295 F.3d at 1036.

Sixth, GSA's policy of providing only the "minimum services necessary" is particularly susceptible to being interpreted so broadly as to allow the discretionary function exception to swallow the FTCA's purpose, especially where, as here, GSA offers only fiscal reasons for its failures.  *See Gotha*, 115 F.3d at 179.  The need for deterrence where the policy proffered is so overwhelmingly financial is great.  To find that ignoring or abandoning the erosion condition was grounded in a policy of providing only the "minimum services necessary" would be to render the FTCA "toothless."  *Cestonaro*, 211 F.3d at 755.  GSA would be free to ignore all of its surplus property on purely fiscal grounds.

**IV.    CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss is **DENIED**.  An appropriate order follows.

/s/ William J. Martini

_____
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: July 15, 2014**